**Dated: August 06, 2026.**

_____
**CHRISTOPHER G. BRADLEY**
**UNITED STATES BANKRUPTCY JUDGE**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Case No. 24-10492-cgb** |
| | § | |
| **JOSHUA CARL HILL,** | § | |
| | § | |
| **Debtor.** | § | **Chapter 7** |
| | § | |
| | § | |
| **MATTHEW EPPRIGHT,** | § | |
| **Plaintiff,** | § | |
| | § | |
| | § | |
| **v.** | § | **Adv. No. 24-01044-cgb** |
| | § | |
| **JOSHUA CARL HILL,** | § | |
| **Defendant.** | § | |
| | § | |
| | § | |

## MEMORANDUM OPINION ON DISCHARGEABILITY OF DEBTS

### Introduction

In this adversary opinion, the Court first considers a judgment creditor's global objection to the debtor's discharge on several different grounds and then the judgment creditor's objection to the discharge of its particular claim. Ultimately, the

1

Court rules against the creditor and determines that the debtor is entitled to his discharge both generally and on this particular claim.

### Factual and Procedural Background

This case arises from an incomplete vehicle restoration project. From 2020 to 2024, Debtor Joshua Carl Hill owned and operated a vehicle restoration company called Exotic Power & Performance ("Exotic"). [1] In 2021, Plaintiff Matthew Eppright, a car collector, purchased a 1985 Ferrari 308 GTS through an online auction. [2] Mr. Eppright hired Mr. Hill and Exotic to restore the Ferrari because Mr. Hill had worked on Mr. Eppright's brother's Ferrari. [3] In May 2021, Mr. Hill began by performing an eight-hour paid inspection of the vehicle. [4]

Mr. Hill's original quote for the restoration was $55,007.52 for "Mechanical/Electrical Restoration," "Exterior Refinish," and "Interior Update." [5] This quote was higher than Mr. Eppright expected, as he wanted the project to be "budget-conscious." [6] Mr. Eppright testified that Mr. Hill explained that the quote was high because the project would require a lot of labor, but "with sourcing parts better," it may end up costing less. [7] Mr. Eppright ultimately agreed to the quote. [8]

The relationship between the parties quickly broke down, and here is where their versions of events start to differ. According to Mr. Hill, the project was delayed due to 1) Mr. Eppright's failure to make payments or respond to messages in a timely manner and 2) unforeseeable complications with the mechanical work on the project. According to Mr. Eppright, Mr. Hill not only far outspent the budget from the original quote, he continued to ask for more money despite doing little work. Mr. Eppright also alleged that in fact, Mr. Hill was incapable of doing the required work in the requested time frame.

By January 2023, the parties were at a standstill. Mr. Hill stopped working due to Mr. Eppright's refusal to pay. Mr. Eppright refused to pay because Mr. Hill kept asking for money beyond the initial estimated amount. The parties could not

---

[1] Transcript of Trial, ECF No. 64, at 58:19–21, 83:18–21, 194:19–21.

[2] *Id.* at 13:20, 22; Pl.'s Ex. 2.

[3] Transcript of Trial, ECF No. 64, at 12:15–13:17.

[4] Pl.'s Ex. 3 at 4–5.

[5] *Id.* at 3–4.

[6] Transcript of Trial, ECF No. 64, at 16:23–25, 17:11–18.

[7] *Id.* at 17:3–5.

[8] *Id.* at 19:11–13.

reach an agreement on completing the project, and Mr. Eppright agreed to pick up the vehicle. It was to some degree disassembled, and parts of it were in boxes.[9] Mr. Eppright's initial testimony was that he had "no clue" what was in the boxes, but later, he agreed that there were "inventory and parts" in the boxes.[10]

In April 2023, Mr. Eppright sued Mr. Hill and his company, Exotic, in state court for deceptive trade practices under the Texas Deceptive Trade Practices–Consumer Protection Act[11] (the "DTPA"), fraud, breach of contract, money had and received and unjust enrichment.[12] Mr. Eppright's state court petition also asked for treble, punitive, and exemplary damages under the DTPA and attorney's fees pursuant to the DTPA and Chapter 38 of the Texas Civil Practice & Remedies Code.[13] Neither Mr. Hill nor Exotic filed an answer or appeared in state court.[14]

Mr. Eppright filed a motion for default judgment in the state court lawsuit, which was granted on July 14, 2023.[15] The state court entered judgment in favor of Mr. Eppright on all counts, and awarded damages, including exemplary damages, treble damages, attorney's fees, court costs, collection costs, contingent appellate fees, and post judgment interest at 8%.[16] In October 2023, an abstract of judgment was recorded in Burnet County, Texas, against Mr. Hill and Exotic in the amount of $388,564.86.[17] Collection efforts were generally unsuccessful.[18] In February 2024, the state court entered an *Order Requiring Turnover and Appointing Receiver* against Mr. Hill and Exotic.[19]

On May 3, 2024, Mr. Hill commenced his voluntary individual chapter 7 case. On July 29, 2024, Mr. Eppright timely objected to Mr. Hill's discharge by filing his adversary complaint [ECF No. 1], which asserts causes of action under 11 U.S.C.

---

[9] Some of the "boxes" likely contained new parts that Mr. Hill had ordered on Mr. Eppright's behalf but had not yet installed. *See, e.g.*, *id.* at 144:9–14.

[10] *Id.* at 44:21–23, 52:14–16.

[11] Tex. Bus. & Com. Code § 17.41 et seq.

[12] Def.'s Ex. 7.

[13] *Id.*

[14] Pl.'s Ex. 24 at 1.

[15] Pl.'s Ex. 24 (motion for default judgment); Pl.'s Ex. 5 ("Default Judgment Against Joshua Hill and Exotic Power & Performance, LLC").

[16] Pl.'s Ex. 5 at 3–4.

[17] Pl's Ex. 23.

[18] *See, e.g.*, Pl.'s Ex. 10; Transcript of Trial, ECF No. 64, at 26:10–17.

[19] Pl.'s Ex. 7.

§§ 523(a)(2)(A), (a)(6),[20] and §§ 727(a)(2)(A), (a)(3), and (a)(4). Mr. Hill filed a motion for partial judgment on the pleadings, which the Court denied.[21] The Court held a trial in this case on March 5, 2026, and closing arguments took place on April 1, 2026.

## Jurisdiction and Authority

The determination of whether a debtor should be denied discharge either of a particular debt or of all debts is a core proceeding over which this Court has jurisdiction under 28 U.S.C. § 157.[22] This matter has been referred to this Court pursuant to the District Court's Standing Order of Reference.[23] All parties filed statements consenting to the Court's authority to enter a final judgment in this adversary proceeding.[24] Therefore, this Court has both jurisdiction and authority to decide this case.

## Legal Standards

Certain prebankruptcy debts are excepted from discharge when, "in Congress's judgment, the creditor's interest in recovering a particular debt outweighs the debtor's interest in a fresh start."[25] Among these particular debts are "any debt for money, property, services . . . to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."[26]

Creditors can also object to the debtor's discharge entirely. Under 11 U.S.C. § 727, "[t]he court shall grant the debtor a discharge" unless certain elements are proven by the creditor by a preponderance of the evidence[27] Here, Mr. Eppright objected to Mr. Hill's discharge under §§ 727(a)(2)(A), (a)(3), and (a)(4).

---

[20] Counsel for Mr. Eppright advised the Court on the record at closing arguments that he no longer wishes to pursue the § 523(a)(6) claim. Audio of 4/1/26 Hr'g.

[21] ECF No. 31.

[22] 28 U.S.C. § 157(b)(1); *see also* 28 U.S.C. § 1334.

[23] Order of Reference of Bankruptcy Cases and Proceedings (W.D. Tex. Oct. 4, 2013).

[24] ECF Nos. 10, 11.

[25] *Bartenwerfer v. Buckley*, 598 U.S. 69, 72 (2023).

[26] 11 U.S.C. § 523(a)(2)(A).

[27] *See Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 177–78 (5th Cir. 1992) (citing *Grogan v. Garner*, 498 U.S. 279, 287–88 (1991)).

## Discussion

### A. Mr. Hill did not transfer property to hinder, delay, or defraud creditors in violation of section 727(a)(2)(A).

Under 11 U.S.C. § 727(a)(2)(A), a debtor cannot receive a discharge if "the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed–property of the debtor, within one year before the date of the filing of the petition."[28]

Here, Mr. Eppright alleges that Mr. Hill transferred property within one year of filing for bankruptcy with the intent to hinder, delay, or defraud Mr. Eppright from collecting on the state court judgment.[29] Specifically, Mr. Eppright alleges that Mr. Hill improperly transferred vehicles to a storage unit, his own money to different bank accounts, his non-filing wife's money to a different savings account, and that he improperly paid his wife's debts.[30]

Mr. Hill's bankruptcy petition was filed on May 3, 2024.[31] Necessarily, then, the Court looks to Mr. Hill's transactions starting on May 3, 2023.[32]

Transfer is defined broadly by the Bankruptcy Code as "the creation of a lien, the retention of title as a security interest, the foreclosure of a debtor's equity of redemption, or each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing with or parting with property or an interest in property."[33] Of course, a creditor can also allege that the debtor "removed, destroyed, mutilated, or concealed" property.[34]

---

[28] *See also Cadle Co. v. Duncan (In re Duncan)*, 562 F.3d 688, 698 (5th Cir. 2009) ("To establish a claim under § 727(a)(2)(A), the plaintiff must prove the following four elements: '(1) a transfer of property; (2) belonging to the debtor; (3) within one year of the filing of the petition; (4) with intent to hinder, delay, or defraud a creditor or officer of the estate.'" (quoting *Pavy v. Chastant (In re Chastant)*, 873 F.2d 89, 90 (5th Cir. 1989))).

[29] Pl.'s Compl., ECF No. 1, at 6–7.

[30] *See, e.g.*, Transcript of Trial, ECF No. 64, at 99:17–101:8, 101:9–18, 103:19–104:2, 105:16–18, 105:25–106:7, 109:22–25, 116:7–17.

[31] *See In re Joshua Carl Hill*, No. 24-10492-cgb, at ECF No. 1.

[32] *See* 11 U.S.C. § 727(a)(2)(A).

[33] 11 U.S.C. § 101(54).

[34] 11 U.S.C. 727(a)(2)(A).

**1.  Mr. Eppright is only required by the statute to prove intent to hinder *or* delay *or* defraud, and this specific intent may be inferred from the circumstances.**

While "proof of actual intent is necessary," intent can be inferred.[35] Factors that may provide evidence of actual intent to *defraud* include:

> (i) a lack or inadequacy of consideration, (ii) a familial or close relationship between the parties, (iii) retention of possession, benefit, or use of the property in question, (iv) the financial condition of the party sought to be charged both before and after the transaction in question, (v) the existence or cumulative effect of a pattern or course of conduct after the incurring of a debt, onset of financial difficulties or threat of suits by creditors, and (vi) the general chronology of the events and transactions at issue.[36]

There is a split of authority as to whether the "intent to hinder, delay, or defraud" requires fraudulent intent even if the debtor is only alleged to have "hindered" or "delayed" a creditor.[37] Some courts, looking to the Uniform Fraudulent Conveyance Act, which was based on Elizabethan law, have held that fraudulent intent is always required.[38] But the Fifth Circuit follows the plain language of the statute, and has held that "an intent to hinder or to delay or to defraud is sufficient."[39] Thus, to find in the creditor's favor, the Court need not find that Mr.

---

[35] *Duncan*, 562 F.3d at 698 (first citing *Chastant*, 873 F.2d at 91, and then citing *Hibernia Nat'l Bank v. Perez (In re Perez)*, 954 F.2d 1026, 1029 (5th Cir. 1992)).

[36] *Epstein v. Busby (In re Busby)*, No. 19-05051-CAG, 2021 WL 1522216, at *7 (Bankr. W.D. Tex. Apr. 15, 2021) (quoting *TSCA-234 Ltd. P'ship v. Moseman (In re Moseman)*, 436 B.R. 398, 408–09 (Bankr. E.D. Tex. 2010)).

[37] *See generally Wiggains v. Reed (In re Wiggains)*, No. 14-03064-sgj, 2015 WL 1954438, at *15–17 (Bankr. N.D. Tex. Apr. 28, 2015).

[38] *See generally* 6 Collier on Bankruptcy ¶ 727.02(3)(a).

[39] *Wiggains v. Reed (In re Wiggains)*, 848 F.3d 655, 661 (5th Cir. 2017); *see also id.* ("Ours is not a novel interpretation. The Supreme Court repudiated common misconceptions that surround a debtor's pre-bankruptcy activities by declaring that '[a] conveyance is illegal if made with an intent to defraud the creditors of the grantor, but equally it is illegal if made with an intent to hinder and delay them.'" (quoting *Shapiro v. Wilgus*, 287 U.S. 348, 354 (1932))).

6

Hill "had the intent to delay *and* hinder *and* defraud."[40] To the contrary, "it is not necessary to prove fraud . . . an intent to hinder or delay suffices."[41]

### 2. Mr. Eppright did not meet his burden.

To show the alleged improper vehicle transfers, Mr. Eppright brought evidence that Mr. Hill paid for a large storage unit for a few months, and then later, Exotic received funds totaling about $107,000.[42] But Mr. Hill testified credibly that the storage unit was used to store customer cars because Exotic's workshop could not fit all of the works-in-progress.[43] Thus it is not clear that even if they *had* been transferred with the requisite intent (which, to be clear, the Court finds was not shown here), there was no sufficient showing that they were property *of the debtor* as required to deny a discharge under this section.

Mr. Eppright's counsel seemed to attempt to shift the burden to Mr. Hill on this point, pointing out, for example, that Mr. Hill had not "provided any documentation so the Court can know that those were customer cars or not."[44] However, the burden was not Mr. Hill's to carry. Mr. Eppright did not produce any evidence that Mr. Hill owned, or transferred ownership of, any cars. Mr. Hill testified that he only owned two cars at the time of filing bankruptcy, that none of the cars he stored were his—and that he was never asked to provide documentation about the cars.[45]

As for the alleged improper deposits, Mr. Hill also explained those credibly and adequately on the record. Exotic's bank statement for September 2023 shows that there were 7 deposits made in that account that month.[46] Four of those deposits came from ShopMonkey, which Mr. Hill testified was a system he used to collect

---

[40] *Cadle Co. v. Todd (In re Todd)*, No. 02-3114, 2003 Bankr. LEXIS 2259, at *9 (Bankr. N.D. Tex. Jan. 13, 2003) (collecting cases); *see also Humphries v. Schnurr (In re Schnurr)*, 107 B.R. 124, 130 (Bankr. W.D. Tex. 1989) ("11 U.S.C. § 727(a)(2)(A) is written in the disjunctive. That means all the plaintiff has to prove is that the debtor hindered his creditors, he delayed his creditors, *or* he defrauded his creditors." (collecting cases)).

[41] *Fed. Deposit Ins. Corp. v. Morris (In re Morris)*, 51 B.R. 462, 464 (Bankr. E.D. Tenn. 1985) (citing *In re Perlmutter*, 256 F. 862, 869 (D.N.J. 1919), *aff'd sub nom. Perlmutter v. Hudspeth*, 264 F. 957 (3rd Cir. 1920)).

[42] *See, e.g.*, Transcript of Trial, ECF No. 64, at 99:12–101:14; *see also* Pl.'s Ex. 11 at 1 (showing $107,973.98 in deposits in September 2023 in Exotic's account ending in 7524).

[43] Transcript of Trial, ECF No. 64, at 100:13–101:4.

[44] *Id.* at 101:5–7.

[45] *Id.* at 170:10–22.

[46] Pl.'s Ex. 11 at 1.

7

invoice payments for Exotic.[47] This is further supported by the other months of bank statements, which all included deposits from ShopMonkey.[48]

Mr. Hill testified that the other large deposits, in the amounts of $66,530.99 and $31,415.00, were "deposits for parts purchases for a couple big projects."[49] Mr. Hill's testimony was that these deposits had to go into this particular account for Exotic because another account had been frozen because Exotic was behind on paying state sales tax.[50]

Similarly, the alleged transfers involving Mr. Hill's non-filing spouse were credibly and sufficiently explained. For example, Mrs. Hill's testimony about one particularly large transfer was that it was a gift from a family member that she transferred to a new bank account to take advantage of a promotional special.[51] The testimony was also that Mr. Hill provided for his wife's daily living expenses most of the time, but that he used her credit card for emergencies, which he then paid off when he was able to do so.[52]

As purported evidence of Mr. Hill's concealment of property and intent to hinder or delay creditors, Mr. Eppright also alleged that Mr. Hill intentionally avoided a deputy that was sent to collect on the state court judgment. However, this was contravened by the testimony that Mr. Hill met with the deputy at least once and the record of the deputy's visits, which were mostly outside of Exotic's business hours.[53]

Ultimately, this was a very fact-intensive determination. The Court considered the entire record, including but not limited to the facts specifically cited above, in reaching its determination. The Court's clear overall impression of the situation is that Mr. Hill, like many small business owners, was operating a business with thin margins. He made financial decisions that were perhaps ill-advised, but the evidence shows—and the Court finds—that his intent was not to hinder, delay, or defraud creditors but to keep his business running and complete the projects he could for his

---

[47] Transcript of Trial, ECF No. 64, at 172:15–173:3.
[48] *See, e.g.*, Pl.'s Ex. 11 at 3, 10, 14, 20, 24, 30, 33.
[49] Transcript of Trial, ECF No. 64, at 171:17–24.
[50] *Id.* at 105:5–6.
[51] *Id.* at 208:19–209:4.
[52] *Id.* at 176:6–11.
[53] *Id.* at 151:18–152:19, 189:13–190:10; *see also* Pl.'s Ex. 10.

existing customers.[54] This is far from meeting the requisite standard for a wholesale denial of discharge under § 727(a)(2)(A).

**B. Mr. Hill kept sufficient financial records under the circumstances of his case for purposes of section 727(a)(3).**

Section 727(a)(3) "requires debtors present a full financial picture to the trustee, creditors, and Court."[55] To deny a debtor's discharge under this provision, first, the creditor must prove by a preponderance of the evidence that "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained."[56] Then, the burden shifts to the defendant to establish "that his failure to keep adequate records was justified under all circumstances of the case."[57]

A creditor need not prove that a debtor acted with fraudulent intent to deceive creditors.[58] "Mere negligence in failing to keep and produce records is sufficient to deny a debtor's discharge under § 727(a)(3)."[59] However, the debtor is not required to have records containing "full detail," but merely "'written evidence' of the debtor's financial condition."[60]

When determining whether a defendant kept sufficient records for a creditor to analyze his financial condition and whether the defendant's failure to keep records was "justified under all circumstances" of the case, a court has wide discretion.[61] Courts have considered, for example, the defendant's education level, the nature of

---

[54] *See, e.g.*, Transcript of Trial, ECF No. 64, at 61:8–10 ("I would probably suffer a great deal more litigation if I didn't complete the rest of the cars that belonged to people who wanted me to complete them.").

[55] *Hobbs v. Roberts (In re Roberts)*, 611 B.R. 261, 272 (Bankr. W.D. Tex. 2020) (citing *Tow v. Henley (In re Henley)*, 480 B.R. 708, 781 (Bankr. S.D. Tex. 2012)).

[56] 11 U.S.C. § 727(a)(3).

[57] *Roberts*, 611 B.R. at 272 (citing *In re Lee*, 309 B.R. 468, 477–78 (Bankr. W.D. Tex. 2004)).

[58] *Id.* (citing *Henley*, 480 B.R. at 781).

[59] *Id.* (citing *Henley*, 480 B.R. at 781).

[60] *Robertson v. Dennis (In re Dennis)*, 330 F.3d 696, 703 (5th Cir. 2003) (citing *Goff v. Russell Co. (In re Goff)*, 495 F.2d 199, 201 (5th Cir. 1974)).

[61] *E.g.*, *id.* at 703 (citing *Goff*, 495 F.2d at 202).

the business, the defendant's compliance with discovery obligations, and the defendant's testimony at trial. [62]

Here, Mr. Hill testified that he successfully completed less than two years of high school. [63] He has worked as a mechanic in some capacity his entire adult life. [64] He testified that he did have staff working for Exotic at one time. [65] He had most recently been working for himself. [66]

Mr. Hill consistently testified that he provided Mr. Eppright's counsel with bank statements pursuant to a discovery agreement. [67] It seemed that Mr. Eppright's counsel also wanted Mr. Hill to produce receipts for his consumer transactions, including for daily expenses such as food, utilities, and gas. [68] However, as Mr. Hill himself pointed out on the stand, Mr. Eppright's counsel seemed able to discern Mr. Hill's spending habits with considerable clarity from the information that was provided in the bank statements. [69]

---

[62] *Hale v. Hilton (In re Hilton)*, No. 19-01081-tmd, 2021 WL 1811519, at *2 (Bankr. W.D. Tex. May 5, 2021) ("While justification is a 'sliding scale' based on sophistication, and [the debtor] was in some ways lacking in sophistication, [the debtor's] failures were ultimately a product of obstinate noncompliance during discovery and in her testimony at trial. Therefore, the inadequate records are not justified under the circumstances."); *see also, e.g., Hughes v. Wells (In re Wells)*, 426 B.R 579, 594 (Bankr. N.D. Tex. 2006) ("The financial records a debtor maintains should be appropriate and reasonable for a debtor of similar sophistication." (collecting cases)).

[63] Transcript of Trial, ECF No. 64, at 118:14–21.

[64] *See, e.g., id.* at 119:2–125:10, 149:17–22.

[65] *Id.* at 116:22–24.

[66] *Id.* at 58:15–18.

[67] Some documents were apparently produced under a discovery agreement that was negotiated by counsel and not presented to the Court. This issue in a different context may raise a question as to whether § 727(a)(3) creates an independent duty to preserve or disclose documents notwithstanding discovery agreements with opposing counsel or other parties in interest. However, the Court declines to answer this question in the context of this case, because here, Mr. Hill provided sufficient documentation. *See Dennis*, 330 F.3d at 703. It is important for counsel to be able to rely on discovery agreements, as the debtor's attorneys did here. Mr. Eppright's counsel is very experienced in litigation, and the Court is comfortable concluding that they could and would have pressed this issue if they had seen fit or if they had thought that Debtor or Debtor's counsel were being strategic rather than acting in good faith in raising objections to discovery requests.

[68] *E.g.*, Transcript of Trial, ECF No. 64, at 115:7–16.

[69] *See id.* at 107:14–20.

10

It is true that creditors should not be "compelled to reconstruct the debtor's affairs."[70] But on the other hand, it is not required of a chapter 7 debtor under these circumstances to provide receipts of all of his daily consumer transactions.[71]

Ultimately, this is not a close call. Under the circumstances of this case, Mr. Hill preserved sufficient records to analyze his financial condition. Mr. Eppright's § 727(a)(3) claim is accordingly dismissed.

### C. Mr. Hill did not fail to disclose bank accounts in violation of section 727(a)(4).

Mr. Eppright's complaint did not specify under which subsections of § 727(a)(4) he wished to object to the discharge, but he alleges that Mr. Hill "knowingly and fraudulently made a false oath or account related to his bankruptcy filings in this case."[72] This language is found in 11 U.S.C. § 727(a)(4)(A), which states that the court shall grant the debtor a discharge, unless "the debtor knowingly and fraudulently, in or in connection with the case– made a false oath or account." For the avoidance of doubt, the other subsections of § 727(a)(4) are not mentioned in the complaint, and no evidence appears to have been presented of them at trial.[73] Thus, the Court will analyze Mr. Eppright's objection to discharge under § 727(a)(4)(A).

A creditor bringing a claim of false oath must show by a preponderance of the evidence that "(1) [the debtor] made a statement under oath; (2) the statement was false; (3) [the debtor] knew the statement was false; (4) [the debtor] made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case."[74] The denial of a debtor's discharge is justified when the debtor makes a false statement or omission in his schedules or makes a false statement "at the examination during the course of the proceedings."[75]

---

[70] *Keils v. Villarreal (In re Villarreal)*, 666 B.R. 157, 166 (Bankr. N.D. Tex. 2024) (quoting *In re Juzwiak*, 89 F.3d 424, 428 (7th Cir. 1996)).

[71] *See, e.g.*, *Wells*, 426 B.R. at 594–95 (discussing a consumer debtor's obligations to provide documents).

[72] Pl.'s Compl., ECF No. 1, at 6.

[73] *See generally* Pl.'s Compl., ECF No. 1.

[74] *Cadle Co. v. Pratt (In re Pratt)*, 411 F.3d 561, 566 (5th Cir. 2005) (citations omitted) (quoting *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir. 1992)); Fed. R. Bank. P. 4005 ("At a trial on a complaint objecting to a discharge, the plaintiff has the burden of proof.").

[75] *Beaubouef*, 966 F.2d at 178.

11

The Plaintiff also drew attention to Mr. Hill's alleged nondisclosure of certain bank accounts, namely those of his wife and those of his business.[76] However, those bank accounts were disclosed in Mr. Hill's schedules as originally filed in this case.[77] Mr. Eppright did not present any evidence of bank accounts that Mr. Hill failed to disclose, and therefore failed to meet his burden of proving that the debtor made a false statement. Mr. Eppright's § 727(a)(4) claim is denied.

### D. Mr. Hill's debt to Mr. Eppright was not obtained by false pretenses, a false representation, or actual fraud in violation of section 523(a)(2)(A).

To deem a debt nondischargeable under 11 U.S.C. § 523(a)(2)(A), an objecting creditor must prove by a preponderance of the evidence that it was a debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."[78] Actual fraud "encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation."[79]

#### 1. Under the conditions here, the state court no-answer default judgment cannot be given collateral estoppel effect.

Mr. Eppright argues that Mr. Hill is collaterally estopped from re-litigating the issue of fraud in this Court due to a state court default judgment.[80] Mr. Eppright also seeks attorneys' fees arising out of this judgment.[81] When a bankruptcy court is evaluating the effect of a state court judgment on a dischargeability proceeding, the bankruptcy court must look to state preclusion law from the state in which the judgment was entered.[82] Here, the default judgment was entered by the 33rd Judicial District Court of Burnet County, Texas, so Texas collateral estoppel law applies.[83]

---

[76] Transcript of Trial, ECF No. 64, at 95:17–97:4.

[77] *Id.* at 161:17–163:2, 166:9–167:5; *see also In re Joshua Carl Hill*, No. 24-10492-cgb, ECF No. 1 at 12, 56–57.

[78] 11 U.S.C. § 523(a)(2)(A); *Grogan*, 498 U.S. at 287–88.

[79] *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 359 (2016).

[80] *E.g.*, Pl.'s Compl., ECF No. 1, at 5 ("As the state district court has already found . . . ."); *see also* Pl.'s Opp. To Def.'s Rule 12(c) Mot., ECF No. 21, at 8–9.

[81] Pl.'s Compl., ECF No. 1, at 5.

[82] *E.g.*, *Guion v. Sims (In re Sims)*, 479 B.R. 415, 420 (Bankr. S.D. Tex. 2012) (citing *Plunk v. Yaquinto (In re Plunk)*, 481 F.3d 302, 307 (5th Cir. 2007)).

[83] The default judgment is in the record as Pl.'s Ex. 5.

12

Under Texas law, the elements of collateral estoppel are: "(1) the facts sought to be litigated in the second action were fully and fairly litigated in the prior action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action."[84] Generally, a default judgment is considered to have been fully and fairly litigated for collateral estoppel purposes.[85] However, Texas courts have differentiated the case of a no-answer default—that is, a default judgment is entered because the defendant failed to answer the plaintiff's complaint.[86] As the Fifth Circuit has stated, "Courts generally hold that no-answer default judgments fail to meet the 'actually litigated' prong of the issue preclusion test."[87]

Here, Mr. Eppright's default judgment is a no-answer default judgment because Mr. Hill did not file an answer in state court.[88] As noted, this fact alone puts its preclusive effect in doubt. Still, if a party seeking to use a no-answer default judgment for collateral estoppel purposes is able to "produce record evidence demonstrating that the state court conducted a hearing in which [the party] was put to its evidentiary burden, collateral estoppel may be found to be appropriate."[89] While the entire state court record is not required, "enough of the prior court's record must be presented to the bankruptcy court for it to make a determination that a trial or hearing was conducted at which the plaintiff met his or her burden of proof."[90]

This requirement was not met. Mr. Eppright provided the default judgment and the motion for default judgment that was filed in the state court, and nothing else.[91] The default judgment entered in the state court explained that the Court considered "the pleadings and papers on file as well the accompanying exhibits and affidavits and argument of counsel."[92] But "the mere assertion that a judgment is

---

[84] *Sims*, 479 B.R. at 420 (citing *Schwager v. Fallas (In re Schwager)*, 121 F.3d 177, 181 (5th Cir. 1997)).

[85] *See, e.g.*, *Cornwall v. Loesch (In re Cornwall)*, 109 F. App'x 682, 684 (5th Cir. 2004) (collecting Fifth Circuit cases about post-answer default judgments).

[86] *Gober v. Terra+Corp. (In re Gober)*, 100 F.3d 1195, 1204 (5th Cir. 1996) (citing *Stoner v. Thompson*, 578 S.W.2d 679, 683 (Tex. 1979)).

[87] *Id.* (collecting cases).

[88] Pl.'s Ex. 5 at 1 ("Defendants were required to file a written answer by 10:00 a.m. on May 22, 2023. Defendants did not do so.").

[89] *Pancake*, 106 F.3d at 1245.

[90] *Chizk v. Ramon (In re Ramon)*, 433 B.R. 571, 584 (Bankr. N.D. Tex. 2010) (first citing *Sheerin v. Davis (In re Davis)*, 3 F.3d 113, 115 (5th Cir. 1993), and then citing *Pancake*, 106 F.3d 1242)).

[91] Pl.'s Ex. 5; Pl.'s Ex. 24.

[92] Pl.'s Ex. 5 at 1.

13

based on evidence and argument is insufficient to support the application of the doctrine of collateral estoppel."[93]

Counsel for Mr. Eppright contended in his closing argument that Plaintiff's Exhibit 24, the motion for default judgment from the state court proceeding, contained a declaration drafted by Mr. Eppright that met his evidentiary burden.[94] And it is true that Plaintiff's Exhibit 24 was pre-admitted without objection.[95] But the only time it was used in the trial was by *Mr. Hill's* counsel on cross-examination of Mr. Eppright.[96] (For its part, that cross-examination was far from encouraging. Mr. Eppright confirmed that the declaration attached to Plaintiff's Exhibit 24 stated that his Ferrari was a total loss—as did the complaint filed in this case.[97] But Mr. Eppright also admitted that the Ferrari was *not*, in fact, a total loss. In fact, he was able to sell it for $15,000 sometime in 2025, after the state court judgment was entered.[98] The sale of the vehicle and/or its parts directly contradicts Mr. Eppright's "total loss" testimony.[99])

Overall, the Court cannot find that the conclusions in the state court default judgment were actually determined from the evidence presented in state court.[100] For a no-answer default judgment to be given collateral estoppel effect, the moving party must produce "record evidence" demonstrating their burden was met in the state court proceeding.[101] The Court is unsatisfied with the record evidence provided

---

[93] *Ramon*, 433 B.R. at 584 (citing *Pancake*, 106 F.3d 1242).

[94] Audio of 4/1/26 Hr'g. Mr. Eppright's counsel also discussed this declaration in his opening statement. *See* Transcript of Trial, ECF No. 64, at 9:9–18.

[95] Transcript of Trial, ECF No. 64, at 5:8–16; 6:16–19.

[96] *See* Transcript of Trial, ECF No. 64, at 41:20–43:19.

[97] Transcript of Trial, ECF No. 64, at 42:21–23; ECF No. 1 at 2, 6.

[98] Transcript of Trial, ECF No. 64, at 43:2–3.

[99] Mr. Eppright testified that the "total loss" testimony in the default judgment affidavit was true at the time because he didn't know until later that he would have been able to sell the vehicle. *See* Transcript of Trial, ECF No. 64, at 42:21–43:11. The Court finds this testimony unconvincing. Mr. Eppright sold the vehicle to an employee at the Petrol Lounge, a car club of which he was a member, for the employee and her husband to try to fix the car. *Id.* at 43:20–44:8. The Court believes that Mr. Eppright was sufficiently knowledgeable in cars to know that there was at least some significant value in what remained of the vehicle and parts. Additionally, while the sale occurred after *this* case was filed, the complaint in this Court was not amended to reflect that the vehicle was *not* a "total loss" even though Mr. Eppright testified that he had informed his attorney of the sale, as the Court believes should have been done as a matter of candor to this tribunal. *Id.* at 43:12–17.

[100] *See Ramon*, 433 B.R. at 584 n. 19 (expressing a lack of confidence in a state court judgment with factual errors).

[101] *See Pancake*, 106 F.3d at 1245.

14

by the Plaintiff here and on the basis of that record cannot find that Mr. Eppright was held to his burden in the state court proceeding.[102]

Accordingly, the Court finds that based on all the relevant facts and circumstances here, the state court judgment should not be given collateral estoppel effect.

### 2. Mr. Eppright did not come close to proving his section 523(a)(2)(A) claim on the merits.

The Court now turns to the merits of the § 523(a)(2)(A) claim. Mr. Eppright alleges that Mr. Hill lied about his ability to competently perform the work, to timely complete the work, and to complete the work for the stated price.[103] The Court finds these claims to be unfounded.

The evidence at trial included several estimates created by Mr. Hill and many emails between Mr. Eppright and Mr. Hill discussing, for example, the work to be done on the Ferrari, quotes for various services and supplies, and the timeline in which the work could be completed. Mr. Hill's estimate form contains language that would limit reasonable expectations of both timing and price. Each estimate states:

> Estimates provided are an approximation of timing and charges to you for the services requested. They are based on the anticipated work to be done. It is possible for unexpected complications to cause some deviation from the original quote.
> [ . . .]
> We are not responsible for any delays caused by unavailability of parts or delays in delivery of parts by the supplier or transporter.[104]

Mr. Hill's emails to Mr. Eppright similarly managed expectations. An initial email from Mr. Hill, sent April 20, 2021, states:

> Please be aware that Labor Times are based on Manufacturer Labor Guides when your vehicle was new and cannot account for Excessively Worn Components or Poorly Performed Prior Repairs. Also be aware

---

[102] Further, the DTPA portion of the judgment "has no preclusive effect on the issue of dischargeability of the debt under section 523(a)(2)(A)." *Stanley v. McLain (In re McLain)*, No. 09-6016-RBK, 2011 WL 1638578, at *4 (Bankr. W.D. Tex. Apr. 29, 2011)).

[103] Pl.'s Compl., ECF No. 1, at 5.

[104] *See, e.g.*, Def.'s Ex. 9 at 1.

that Parts Pricing is constantly changing due to Varying Stock Levels, Customs/Tariffs/Freight Costs and Exchange Rates. As such, It Is Possible that the Labor Times and Parts Costs on Your Final Invoice will Reflect these Fluctuations.[105]

When Mr. Eppright emailed Mr. Hill asking whether the Ferrari would be ready for a car show in October 2021, Mr. Hill replied: "Hey Matt, it is definitely possible. The car is too far from completion to absolutely promise right now, but I will work towards meeting that deadline."[106]

Mr. Eppright asserts that "Hill falsely represented to Eppright that he had the expertise, experience, and ability to restore Eppright's Ferrari in a good and workmanlike manner that was consistent with industry standards, within a few months' time, and he knew at that time that the statements were made that they were false and fraudulent."[107] The Court is unconvinced. The evidence shows that Mr. Hill made reasonable representations about what was *possible* with the vehicle's restoration, but that Mr. Hill was careful not to promise anything in light of many unknown factors concerning this decades-old used Italian sports car.

Further, the evidence admitted by both sides showed that Mr. Eppright contributed to the delays with this job, particularly in replying to emails and in payment. For example, on August 5, 2021, Mr. Hill messaged Mr. Eppright asking for a wire transfer of $7,500 to make a down payment to the paint shop that would be working on the Ferrari.[108] Mr. Hill followed up to ask again on August 12, 2021, stating, "Bodyshop has the car but is waiting to get started."[109] The next communication from Mr. Eppright was not until November 4, 2021, asking for a status update, to which Mr. Hill responded less than an hour later, "I've billed out all the hours and parts I could against the original deposit. I'll need another deposit of $12.5k to get the paint shop moving along, which will hold us over until it returns and is ready to be assembled."[110] Yet, the evidence shows that Mr. Eppright did not remit payment for more than a month. Mr. Eppright messaged on December 28, 2021,

---

[105] Def.'s Ex. 10 at 2.

[106] Pl.'s Ex. 3 at 10.

[107] Pl.'s Compl., ECF No. 1, at 5.

[108] Pl.'s Ex. 3 at 10.

[109] *Id.*

[110] *Id.* at 10–11.

16

asking if Mr. Hill received a check.[111] Mr. Hill replied a mere twenty-six minutes later stating that the check was received and deposited.[112]

The Court also has doubts concerning Mr. Eppright's testimony about his expectations for the repair. Mr. Eppright was clearly what one could term a "car guy." He testified that he has a collection of cars and hangs out with fellow car collectors at the Petrol Lounge.[113] He also seems to be closely involved with his brother's car collection, as evidenced by his testimony and his discussion of his brother's car in messages with Mr. Hill.[114] Given his knowledge and experience, Mr. Eppright surely should have been aware that a repair job like this would not necessarily run smoothly, on time and on budget, that unforeseen challenges might well arise.

The parties dispute the extent to which the car was functional when it reached Mr. Hill's shop. Mr. Eppright claims that it was functional, because he drove it for about a mile (although he admits it "did run a little rough").[115] Mr. Hill contends that the car didn't run for him.[116] The evidence supports Mr. Hill's assessment of the vehicle. In emails on May 11, 2021, Mr. Hill stated, "I just tried to fire the car up and go for a short drive and it won't start" and Mr. Eppright replied, "Kk, it's got issues."[117] This shows that at that time, Mr. Eppright was well-apprised of the mechanical problems with the car.

Mr. Eppright admits he is not a mechanic.[118] The credible testimony by Mr. Hill, on the other hand, demonstrates that he is experienced and knowledgeable, particularly about Ferraris.[119] Mr. Hill's opinion, as evidenced in both his testimony and his contemporaneous communications with Mr. Eppright, was that there were significant unforeseen issues with the engine that would take further time, labor, and money to fix.[120] Mr. Eppright wasn't willing to pay for those repairs, which was certainly his choice—but doesn't constitute fraud on Mr. Hill's part.

---

[111] *Id.* at 11.
[112] *Id.*
[113] Transcript of Trial, ECF No. 64, at 44:1–5, 45:14–20.
[114] *Id.* at 13: 9–10, 46:1–2; Pl.'s Ex. 3 at 10–11.
[115] Transcript of Trial, ECF No. 64, at 15:16–20.
[116] *Id.* at 76:1–6.
[117] Pl.'s Ex. 3 at 6.
[118] Transcript of Trial, ECF No. 64, at 28:12–13, 38:18–21, 53:17.
[119] *Id.* at 127:3–129:23.
[120] *See generally, e.g., id.* at 132:20–142:18.

17

Mr. Eppright attempted to use a YouTube video in which Mr. Hill appears, apparently as evidence that Mr. Hill's business practice is to leave work incomplete or to drag it out for more money, and then to threaten his clients with a lien or storage fees when they don't pay up.[121] The Court found this completely unconvincing, and the introduction of these videos a distraction from the matters really at issue in this trial.

Whether or not this was a common practice for Mr. Hill, Mr. Eppright complains that Mr. Hill did in fact threaten to charge him storage fees or put a lien on his car after payment delays. That appears to be true, but it is not evidence of wrongdoing on Mr. Hill's part. The evidence shows that Mr. Eppright was slow to communicate and pay. It is a normal business practice in the industry, as contemplated by the relevant law, to put a lien on a vehicle when a client has delayed payment.[122] This protects the mechanic's right to payment. Whatever he may have threatened, Mr. Hill never put a lien on Mr. Eppright's vehicle.[123] (Mr. Hill did, at one time, charge Mr. Eppright storage fees, but he ended up taking them off of the invoice.[124] In any case this, too, would not have been evidence of any sort of unsavory or fraudulent practices on this record.)

Mr. Eppright testified that Mr. Hill had serviced Mr. Eppright's brother's Ferrari, and that his brother had recommended Mr. Hill as "a good Ferrari mechanic that can do a restoration."[125] In two separate ways, this testimony cuts against Mr. Eppright's argument that Mr. Hill's business practices are to scam his clients: first, there was no testimony that Mr. Hill engaged in any suspicious business practices with Mr. Eppright's brother, or certainly Mr. Eppright would not have hired Mr. Hill. Second, if Mr. Hill took extra time or charged extra money to Mr. Eppright's brother, Mr. Eppright would have been on notice from his brother's prior dealings and so could not have reasonably expected the project to be completed on time or under budget.

While the Court has dealt with this claim last, it is in a way the heart of this suit, because it is what led to all of the rest. But in the Court's view, the evidence for

---

[121] Pl.'s Ex. 22.

[122] *See* Tex. Prop. Code § 70.001.

[123] Transcript of Trial, ECF No. 64, at 194:7–9.

[124] *Id.* at 194:13–14; *see also id.* at 79:14–18 ("What I can say is that the storage fee is used as a[n] attention getter to get someone who's not acknowledging me to acknowledge me. So it's not unusual to, you know, write those off once you get acknowledgement and approval to continue to work. I don't actually want to charge storage fees.").

[125] *Id.* at 12:17–19, 13:6–10.

18

the Plaintiff's side of this claim is weak. Obviously, this car restoration project did not go well for either party. Mr. Hill was not able to complete the work that he set out to complete. Mr. Eppright did not receive the "budget-conscious" repair he sought. But this incompletion was due to multiple factors, including unforeseeable mechanical issues with the car, availability of parts, timing of outsourced labor, and Mr. Eppright's delays. Not false pretenses, false representations, or actual fraud. Mr. Eppright's § 523(a)(2)(A) claim is denied.

## Conclusion

All claims against Mr. Hill will be denied. The Court will enter a separate judgment consistent with this ruling.

# # #